IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE ALTON & SOUTHERN RAILWAY COMPANY,** | |
| **Plaintiff,** | |
| v. | Case No. 3:17-CV-01249-NJR |
| **CSX TRANSPORTATION, INC.,** | |
| **Defendant.** | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are a Motion to Compel (Doc. 108) filed by Defendant CSX Transportation, Inc. ("CSX"), Proposed Findings of Fact and Conclusions of Law ("Proposed Findings") on that motion entered by Special Master Stephen Williams (Doc. 136), and an Objection (Doc. 139) to the Proposed Findings filed by Plaintiff The Alton & Southern Railway Company ("A&S"). CSX responded to the Objection (Doc. 143) and A&S filed a reply (Doc. 144). The Court also conducted an *in camera* review of the documents at issue. For the reasons set forth below, the Court adopts in part and rejects in part the Proposed Findings, granting in part and denying in part the Motion to Compel.

FACTUAL & PROCEDURAL BACKGROUND

This action stems from a contractual dispute between A&S and CSX (Doc. 1). A&S filed the instant complaint in 2017, alleging that CSX failed to pay approximately $4.3 million in holding charges (*Id.*). After litigation commenced, A&S conducted an internal

investigation of its billing practices, which caused A&S to modify its assessment of the quantity of unpaid holding charges. A&S amended its complaint in March 2019, changing its estimate of unpaid holding charges to close to $20 million (Doc. 64). CSX learned that this new estimate was the result of an audit conducted between August and November of 2018 (the "Special Investigation") and sought production of records relating to that audit (Docs. 108, 108-3). A&S objected to production and claimed work-product protection and attorney-client privilege (Doc. 110). On May 19, 2020, this Court appointed retired Magistrate Judge Stephen C. Williams as Special Master to review 213 documents and present proposed findings resolving assertions of work product protection and attorney-client privilege (Doc. 130).

On June 25, Williams presented his Proposed Findings, recommending that CSX's motion to compel be granted for all but 19 of the withheld documents (Doc. 136 at 2). Reviewing the documents in question, Williams found that while the Special Investigation was related to the instant litigation, litigation was not the "primary purpose" of the Special Investigation (*Id.*). Rather, Williams found that the Special Investigation arose out of a routine corporate audit and that similar review of holding charges would likely have occurred regardless of the pendency of this action (*Id.* at 4).

To start, the Court notes that it has fully reviewed the 213 documents in question and that it agrees with Mr. Williams's breakdown of the individual documents into categories I-IX in the Appendix to his Proposed Findings (*Id.* at 23-25). For this reason, the Court will refer to those categories and will not extensively revisit Mr. Williams's findings surrounding the nature of the individual documents. The Court diverges from

Williams, however, in its interpretation of the law of this Circuit and its application of the law to the facts at hand.

## LEGAL STANDARD

As the parties have not agreed otherwise, the Court will review *de novo* the Special Master's findings of fact and law. Fed. R. Civ. P. 53(f). This means that the Court will conduct its own independent review of the evidence and arguments, giving no presumptive weight to the Special Master's Report. *See Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013).

## ANALYSIS

### I. Work Product Protection

The Court's differences with the Proposed Findings as to the scope of work product protection stem from two key points: its interpretation of the Seventh Circuit's case law on work product protection and its analysis of the origins of the Special Investigation as reflected in the documents.

It is well established that a document will be afforded work product protection if it was prepared "in anticipation of litigation[.]" Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 509-12 (1947). In determining whether documents were prepared "in anticipation of litigation[,]" federal circuits have split, enunciating three distinct standards. *See generally*, Edward J. Imwinkelried, The New Wigmore: Evidentiary Privileges § 1.3.11. The majority rule holds that a document should be protected where it "can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (quoting Charles Alan Wright,

Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)) (citing *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118-19 (7th Cir. 1983)); *see generally* Greenwald et al., 1 Testimonial Privileges § 2:18 (3d ed. 2019). The Fifth Circuit, however, espoused a different standard, finding that documents would only be protected if the "primary motivating purpose" of their production was litigation. *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981); *see generally* Testimonial Privileges § 2:17. Lastly, the First Circuit complicated matters still further, finding that documents would be protected if produced "*for use* in litigation[.]" *United States v. Textron Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (emphasis added); *see generally* Testimonial Privileges § 2:19. Generally, the "for use" and "primary motivating purpose" standards are considered to be more stringent than the majority "because of" standard. Testimonial Privileges § 2:18.

Even where documents are granted work product protection, that protection is not absolute, and documents containing "fact" work product may still be produced upon a sufficient showing of substantial need by the requesting party. Fed. R. Civ. P. 26(b)(3)(A)(ii); Appleton Papers, Inc. v. EPA, 702 F.3d 1018, 1023 (7th Cir. 2012). A smaller subset of work product involving "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation[,]" dubbed "opinion" work product, is afforded protection that is "for all intents and purposes absolute." *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D. Ill. 2002).

The Court notes that the Special Master—as well as both of the parties—have sought to apply the "primary motivating purpose" standard to the documents at issue (Docs. 136 at 10, 122 at 3, 121 at 6). The parties and the Special Master rely on the Seventh Circuit's decision in *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109 (7th Cir. 1983). Indeed, in *Binks* the Seventh Circuit included a substantial block quote from *Janicker v. George Washington University*, 94 F.R.D. 648, 650 (D.D.C. 1982), which includes the phrase "primary motivating purpose[.]" *Binks*, 709 F.2d at 1119. The Seventh Circuit cited *Janicker* not for the primary purpose test, however, but rather for its discussion of whether litigation must be pending or only a "mere contingency[.]" *Id.* Elsewhere in the same opinion, the Seventh Circuit approvingly cites Wright & Miller, 8 Fed. Prac. & Proc. Civ. § 2024, for the proposition that "the test should be whether…the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation." *Id.* Indeed, the Seventh Circuit ultimately denied work product protection in *Binks* based on a finding that "the appellant has failed to meet its burden of proving that the memoranda were prepared…*because* of the prospect of litigation." *Id.* at 1120. If *Binks* left any doubt as to the Seventh Circuit's test for work product protection, the court has repeatedly reaffirmed its use of the "because of" test. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2009) (holding that work product protection applies when documents "have been prepared…*because of* the prospect of litigation.") (emphasis added); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996) ("we look to whether in light of the factual context the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.")(quotations omitted) (emphasis added).

The Court notes that despite these decisions of the Seventh Circuit, many district courts in this Circuit appear to apply the "primary motivating purpose" standard, largely relying on the single quotation in *Binks*. *E.g., Baxter Int'l, Inc. v. Versicherung*, 224 F. Supp. 3d 648, 655 (N.D. Ill. 2016); *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 795 (N.D. Ill. 2015); *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 388 (N.D. Ill. 2012); *Heriot v. Byrne*, 257 F.R.D. 645, 663 (N.D. Ill. 2009); *Equity Residential v. Kendall Risk Mgmt.*, 246 F.R.D. 557 (N.D. Ill. 2007); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 87 (N.D. Ill. 1992); *Valley Forge Ins. Co. v. Hartford Iron & Metal*, Inc., 2018 U.S. Dist. LEXIS 19695 at *6 (N.D. Ind. Feb. 6, 2018); *Chartraw v. City of Shawano*, 2017 U.S. Dist. LEXIS 187590 at *11 (E.D. Wis. Nov. 14, 2017). A cursory review of cases citing *Binks* indicates that approximately 150 district court decisions from this Circuit use the "because of" standard, while roughly 80 decisions use the phrase "primary motivating purpose" and nearly 50 decisions use both phrases side-by-side in applying some chimera of the two standards. Clearly, there is some confusion in the Circuit as to which standard is to be applied and whether the two phrases do indeed give rise to substantively different standards for assessing whether work product protection is warranted. This Court, reviewing the decisions of the Seventh Circuit in *Binks*, *Sandra T.E.*, and *Logan*, as well as the secondary literature on the subject, is inclined to take the view that the two standards are distinct, that the "because of" standard is the law of this Circuit, and that this standard is less stringent than the "primary motivating purpose" test.

Even if there was no difference between the two standards, or if a more stringent "primary motivating purpose" test were to be applied, the Court would still differ from

the Proposed Findings because it takes a different view of the nature of the Special Investigation, its inception, and its progression. The Special Master places significant emphasis on a single sentence from the Special Review/Executive Summary document which states that "while conducting a recent audit of A&S (reported in August 2018), Corporate Audit was advised that active litigation with CSX was in progress concerning disputed holding charges…At the request of the Law Department, Corporate Audit conducted a separate review of the holding charges" (Doc. 136 at 3). Taken out of context, this sentence does appear to indicate that the Special Investigation evolved out of a routine audit of A&S, and it might seem natural to conclude that the same findings would had been uncovered in the natural course of that audit even without the Special Investigation. This Executive Summary, however, was prepared at the end of the Special Investigation. In order to gain a better understanding of the evolution of the Special Investigation, the Court feels that it is more instructive to look to documents contemporaneous with its inception.

The Special Investigation appears to have arisen as a direct result of an email sent by Jeffrey Berman, an attorney in Union Pacific's Law Department, to Chandra Henley in Union Pacific's Corporate Audit group on August 30, 2018 (*E.g.*, UP-0020463). That email provided that the Union Pacific Law Department was "chartering an investigation arising under" this action into "charges assessed by [A&S] to [CSX] for under [sic] [A&S] Tariff 8002, Item 150" and requested that personnel from the Corporate Audit group be assigned to the Special Investigation (*Id.*). Henley responded on September 6, 2018, with an email to Berman providing a list of team members from the Corporate Audit group

and noting that Berman should subsequently coordinate with Andrea Fillaus, the team leader (*Id.*). Notes related to the September meeting of Union Pacific's Audit Committee do indicate that the Union Pacific Corporate Audit group had audited A&S's compliance with regulations of the Federal Railway Administration related to safety and hazardous materials (UP-0020895). In the course of this audit, the Audit Group was "advised of active litigation" (*Id.*). However, given that this routine audit was related to safety practices, there is no indication that auditors would have looked into A&S's tariff billing practices, absent a request from the Law Department. The Special Master suggests that the results of the Special Investigation would in due course have naturally been replicated by Union Pacific's routine audits, but this conclusion seems somewhat speculative and unsupported by the record. It seems quite clear to the Court that the particular team which conducted the Special Investigation was assembled at the behest of the Law Department for the purpose of answering questions pertinent to this action and that Union Pacific's audit group would not otherwise have taken such a granular look at A&S's tariff billing practices.

That said, the Special Investigation was not the only audit ongoing—Union Pacific continued to conduct routine auditing activities and seems to have had a corporate audit committee which created periodic general audit reports and held monthly meetings with agendas and minutes, as would be standard practice for an entity of Union Pacific's size and sophistication. In late October, after the Special Investigation had conducted extensive diligence into A&S tariff billing practices, Andrea Fillaus indicated in an email to members of the team that he had been told that the full report of the Special

Investigation's audit should be included "in the Audit Committee materials," noting that it would not be treated differently "than any of our other billing disputes / litigation with other customers" (UP-0020558). Following this, a large number of emails and documents involve the drafting and revision of submissions from the Special Investigation team to the Audit Committee and the Audit Committee's agenda, notes, and compilation of the Union Pacific General Auditor's Report for November 2018 (*see* Groups IV, V of Doc. 136 at 23-24). These documents thus contained some information that arose out of the Special Investigation but primarily were compiled for routine corporate audit practices. Separately, the Special Investigation team compiled the report requested by Berman, leading to another assortment of documents relating to the drafting of the "Special Review / Executive Summary" (*see* Groups I, II, III of Doc. 136 at 23).

Thus, in addition to its own finished product, the Special Review document, the findings of the Special Investigation were also used in a variety of ways in Union Pacific's routine audit activities. This, however, does not mean that documents related to the Special Investigation are not entitled to work product protection. The investigation team appears to have been assembled at the behest of the Law Department because of the instant litigation, and its primary motivating purpose appears to have been to answer questions for the Law Department relating to this action. In the course of its investigation, the team did make findings that were significant to A&S and Union Pacific as a whole, and for that reason they were subsequently incorporated into more general corporate audit documents and utilized by the Audit Committee.

But this later use for general audit purposes should not vitiate work product protection. Indeed, A&S and Union Pacific seem to have been careful to keep the findings of the Special Investigation somewhat separate from other general audit materials, noting that materials related to the investigation should not be disclosed to outside auditors at Deloitte with other Audit Committee materials (UP-0021303). Even where included in the General Auditor's Report for November 2018, the findings of the Special Investigation are discussed in the context of a number of other "special investigations" which generally appear to have been initiated in response to specific concerns or controversies rather than standard periodic audits (*E.g.*, UP-0021569). The Special Master and CSX cite *United States v. Frederick*, 182 F.3d 496 (7th Cir. 1999), for the proposition that dual-use documents may not be protected under the work product doctrine. That case, however, dealt with ordinary tax returns which would have needed to be prepared regardless of any prospect of litigation. *Id.* at 501. As the Court has discussed, that is not the case with the documents at issue here.

Accordingly, the Court finds that the documents prepared primarily in relation to the Special Investigation should be granted work product protection, while documents that incorporate findings of the Special Investigation should be redacted before any production. Documents in groups I, II, III, VI, VII, VIII, and IX are afforded work product protection. Documents in groups IV and V are generally not protected but do have discrete sections containing findings generated by the Special Investigation that will also be afforded protection. Documents in groups IV and V could be produced in a redacted form, though it is not clear that they would be pertinent to CSX's requests for production

and interrogatories if they were redacted to remove findings of the Special Investigation, so the Court will not order their production at this time.

Of these documents, documents in groups III, VI, and VII will be considered fact work product for they involve no conclusions, opinions, or legal theories concerning the litigation but rather deal with the underlying data used by the Special Investigation to reach its conclusions. Documents in groups I, II, VIII, and IX, as well as the sections of documents in groups IV and V, involving findings of the Special Investigation, will be considered opinion work product for they involve conclusions by party representatives that concern the instant litigation.

CSX argues that it has a substantial need for A&S's fact work product from the Special Investigation, and that it will incur substantial hardship in seeking to replicate this data. It notes that its defense in this action turns on the method used by A&S for interpreting and calculating its tariff and that it cannot ascertain the financial treatment of the charges without the information withheld by A&S. A&S contends that it has already supplied CSX with other data, namely the EDI 4184 and interchange AEI reader information for each charge, which A&S says is sufficient to consider the basis of A&S's calculation of the tariff. The Court sees the EDI and AEI data as likely to provide an overly granular view of tariff application, which would make it extremely difficult for CSX to adequately assess the financial treatment of the tariff charges without the sort of broader-scope data compiled by the Special Investigation. As CSX cannot compile this information from any other source, the Court finds that CSX has made a sufficient showing of a substantial need in order to overcome work product protection for relevant

fact work product. Accordingly, documents from groups III, VI, and VII should be produced.

## II. Attorney-Client Privilege

Where the jurisdiction of the Court is based on diversity of the parties, the Court must look to the choice of law principles of the forum state to determine which law of privilege should apply. *See* Fed. R. Evid. 501; *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006); *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, 2011 WL 1375011 at *4 (S.D. Ill. April 12, 2011). In this Court, this means that Illinois choice of law principles will be applied. *Tanner*, 433 F.3d at 915; *In re Yasmin*, 2011 WL 1375011 at *4. Illinois relies on Section 139 of the Restatement (Second) of Conflict of Laws, which provides that the privilege law of the state with the most significant connection to a particular communication will be applied. *Allianz Ins. Co. v. Guidant Corporation*, 869 N.E.2d 1042, 1048-49 (Ill. App. Ct. 2007); *In re Yasmin*, 2011 WL 1375011 at *10. Here, the documents in question all relate to interactions between the parties in Illinois, and Illinois law on attorney-client privilege applies, rather than federal common law.

In Illinois, "[w]here legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communication relating to that purpose, made in confidence by the client, is protected from disclosure by the client or lawyer, unless the protection is waived." *Robert R. McCormick Found. v. Arthur J. Gallagher Risk Mgmt. Servs.*, 2019 IL 123936, ¶ 19. When the client is a corporation, however, Illinois law affords privilege only to communications with members of the corporation's "control group." *Caldwell v.*

*Advocate Condell Med. Ctr.*, 2017 IL App (2d) 160456, ¶ 70 (citing *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250 (1982)). An employee is deemed within the control group if his role in a particular area is such that a final decision would not normally be made without his opinion, or that opinion forms the basis of a final decision made by those with actual authority. *Id.* Individuals who merely supply information to other individuals who also occupy a merely advisory role are also not members of the control group. *Id.*

The Special Master found that four documents, all emails, are protected by attorney-client privilege. Doc. 136 at 21. None of those documents, however, involved communication with a lawyer or related to legal advice, and the Court finds that they are not privileged. A&S contends in its privilege log that those documents are communications with "representatives" of an attorney, and should thus be privileged, citing *Selby v. O'Dea*, 90 N.E.3d 1144, 1155 (Ill. Ct. App. 2017). That case dealt with common-interest exception to the waiver rule, looking for examples to other states which had enacted provisions based on Unif. R. Evid. 502, which extends attorney-client privilege to communications with a "representative of the lawyer," defined as one who is "employed by the lawyer to assist the lawyer in rendering professional legal services." *Id.*; *see also* Vt. R. Evid. 502 (for an example of Unif. R. Evid. 502 as enacted). Illinois has not enacted this definition from the Uniform Rules of Evidence, and even if it had, the individuals involved in the Special Investigation would not fall within the definition of "representative of a lawyer" as the services they rendered related to auditing and not the practice of law. Of the small subset of documents at issue here that actually involve communications with an attorney, very few involve legal advice. The Court finds that

only documents UP-0020619, UP-0020620, UP-0020622, and UP-0021451 involve communications with an attorney relating to legal advice, and only those documents are protected by attorney-client privilege.

### CONCLUSION

Accordingly, the Court **GRANTS in part** and **DENIES in part** CSX's Motion to Compel (Doc. 108). The Court **ORDERS** A&S to produce documents from groups III, VI, and VII as those groups are described in the Proposed Findings (Doc. 136 at 23-25) within **14 days**.

Finally, the Court expresses its sincere thanks to the Special Master for his time and effort. Although not adopted in full, his report and recommendations were helpful to the Court in resolving the issues.

**IT IS SO ORDERED.**

DATED:   August 24, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**